Donna Sullivan,

   *Plaintiff,*

   *v.*

Quest Diagnostics, LLC,

   *Defendant.*

Civil No. 3:16-cv-902 (JBA)

February 21, 2018

## RULING ON MOTION FOR SUMMARY JUDGMENT

Plaintiff Donna Sullivan was terminated by her employer, Defendant Quest Diagnostics, LLC ("Quest"), and brought suit alleging wrongful termination in violation of the Age Discrimination in Employment Act ("ADEA"), the Americans with Disabilities Act ("ADA"), and the Connecticut Workers' Compensation Act. Defendant moves [Doc. # 38] for summary judgment on all claims, contending that it terminated Plaintiff not for any discriminatory or retaliatory reason, but as a result of an ongoing pattern of patient and client complaints about Plaintiff. For the reasons set forth below, the Court GRANTS Defendant's Motion for Summary Judgment on all three claims.

### I.  Background

Plaintiff claims that she was wrongfully terminated on the basis of her age, perceived disability, and in retaliation for her filing for workers' compensation benefits. Defendant contends that "the undisputed facts demonstrate that Quest terminated Plaintiff's employment due to numerous patient complaints about Plaintiff and her continued unsatisfactory performance after

multiple warnings" and that "[t]here is no evidence that Plaintiff's age, alleged perceived disability or prior workers' compensation claims played any role in Quest's decision to terminate her employment." (*Id.* at 1.)

Plaintiff began working for Quest as a Phlebotomy Services Representative at Quest's Patient Service Center ("PSC") located in Southbury, Connecticut on May 11, 2009. (Pl.'s L.R. 56(a)2 Stmt. [Doc. # 40-2] ¶ 1.) At that time, Plaintiff was 49 years old. (*Id.*) After a year there, Plaintiff received a requested transfer to Quest's PSC located in Wallingford, Connecticut. (*Id.* ¶ 11.) As a Phlebotomy Services Representative (and later, as a "Phlebotomy Services Representative II" performing the same job duties), Plaintiff was responsible for collecting a variety of specimens from patients for testing, including blood, urine and stool. (*Id.* ¶ 3.) Plaintiff was also expected to maintain accurate records, verify patient information and handle associated record-keeping and payment processing. (*Id.*) In performing her job duties and responsibilities, Plaintiff was required to "greet customers appropriately" and to "treat all customers in a courteous manner." (*Id.* ¶ 4.) Plaintiff understood that Quest emphasized the importance of treating customers in a courteous and professional manner, in part, to help patients feel comfortable because "they generally don't like having their blood drawn." (*Id.* ¶ 5.) Plaintiff also understood that her job duties required her to "communicate[] appropriately with clients, patients, coworkers, and general public," to "demonstrate[] good organization, communication, and interpersonal skills" and to "be able to manage concerns of patients and employees in a professional manner." (*Id.* ¶ 6.) Plaintiff further understood that her job duties required her to be "capable of handling multiple priorities in a high-volume setting." (*Id.* ¶ 7.)

Plaintiff acknowledged receipt of her 2011 review on February 23, 2012. (Ex. 7 (2011 Review) to Def.'s Mot. Summ. J. [Doc. # 38-3] at 9.) Plaintiff was evaluated as "achiev[ing]

expectations" in the categories of "following policies & procedures," "patient interaction & communication," "deliver[ing] quality services," "specimen collection & processing," and "patient information management," while she was rated as "excellent" in the categories of "teamwork & collaboration" and "work orientation." (*Id.* at 8.) Plaintiff's supervisor at the time, Alison Menard, commented in the written review—in addition to several positive comments—that "Donna has a few rudeness complaints this year and needs to practice the three steps of services with every patient." (*Id.* at 9.) Plaintiff's supervisor further commented that "[s]uccess for Donna this year is to be aware of possible negative situations and try and turn them into positive ones." (*Id.*)

On February 13, 2012, a patient complained about the phlebotomist they had just seen at Quest's Broad Street PSC, noting, among other comments, that "I have never been spoken to in such a condescending manner in my life." (Ex. 8 to Def.'s Mot. Summ. J. [Doc. #38-3] at 14.) On February 22, 2012, Susan Basile, who supervised Alison Menard, forwarded the complaint to Menard. (*Id.* at 13.) The name "Donna S." has been handwritten on the printed copy of the email chain that is part of the record, but the record does not reflect the basis for determining that the patient was in fact complaining about Plaintiff, or who made that determination. (*Id.*) Plaintiff denies that this patient complaint referred to her, and contends that the Broad Street location in Meriden "is not Plaintiff's normal work site and is a work site with a lot of employees." (Pl.'s L.R. 56(a)2 Stmt. ¶ 16.) At her deposition, however, Plaintiff conceded that she "used to fill in [at different Quest PSCs] all over the place[,]" including the location in question. (Ex. A (Sullivan Dep.) to Pl.'s Mem. Supp. of Pl.'s Obj. to Def.'s Mot. Summ. J. [Doc. # 40-4] at 12.) Plaintiff testified at her deposition that the language attributed to the offending phlebotomist by the complaining patient in question was "like not even my vocabulary." (*Id.* at 9.) Plaintiff did not recall having the interaction in question or Menard raising the issue with her. (*Id.* at 10.)

On June 6, 2012, Susan Basile emailed Allison Menard regarding a complaint by a different patient whom Basile had determined "was serviced by Donna Sullivan." (Ex. 9 to Def.'s Mot. Summ. J. [Doc. #38-3] at 16.) In an email to Dot Burts, Basile wrote that "[w]e have addressed this behavior before in her review and counseling" and that "[w]e are going to the next step of disciplinary action to a summary." (*Id.*) In reply, Dot Burts told Basile "[y]ou do realize that you can skip steps depending on the severity of the incident." (*Id.*) The next email on the chain is Basile emailing Menard, then Plaintiff's immediate supervisor, telling Menard "[p]lease move to written." (*Id.*)

The underlying complaint discussed in this email chain came to Quest not from the patient, but from Quest's "client"—the referring provider from whom Quest was apparently seeking new business. (*Id.* at 17.) The officer manager at that provider called someone at Quest, "furious at a [blood] draw that took place" and "frothing at the mouth, demanding the phlebotomist be fired[.]" (*Id.*) The client "stated that the patient said that the draw was terrible, she is bruised from the shoulders to the elbow, and . . . the phleb made derogatory comments about the doctor and the testing the entire time." (*Id.*) The patient complained about the phlebotomist being "very loud, sarcastic, snide, and just uncouth." (*Id.* at 18.)

On June 7, 2012, Menard spoke with Plaintiff about this complaint, in a Summary of Discussion created on June 8, 2012 and signed by Plaintiff on the same day. (Ex. 10 to Def.'s Mot. Summ. J. [Doc. #38-3] at 20.) The Summary of Discussion notes that "[y]our actions resulted in a phone call and letter to be written to the doctor to apologize for your behavior in questioning his ability as a physician and to apologize for the negative manner in which we serviced his patient." (*Id.*) The Summary further notes "please be advised that continued unacceptable job performance

such as the situation cited above may jeopardize your continued employment with Quest Diagnostics." (*Id.*)

Plaintiff received her 2012 performance review from Ms. Menard on January 29, 2013. (Ex. 11 to Def.'s Mot. Summ. J. [Doc. #38-4] at 6.) For 2012, Plaintiff received an overall rating of "achieves expectations." (*Id.* at 5.) For the category of "patient interaction & communications" Plaintiff received a rating of "achieves expectations" and received mixed comments, including "[i]n June Donna received a summary of discussion for a negative interaction with a patient resulting in the MD questioning Quest Diansotics [sic] ability[,]" "Donna needs to be careful in expressing herself in a negative manner[,]" and "Donna has received many positive comments regarding the service they receive at the Wallingford PSC." (*Id.* at 2-3.) In the "deliver quality services" category, Plaintiff received a "development needed" rating, and the associated comment notes that "Donna had 11 patient impact errors this year[.]" (*Id.* at 3.) In the manager comments section of the review, Menard wrote:

> Success for Donna in 2012 was to be aware of possible negative situations and try and turn them into positive ones. Donna has shown marked improvement in this area but still seems to have challenging situations.
>
> Success for Donna in 2013 is to change all negative situation [sic] into positive ones. Donna must be careful not to show her body language during a difficult encounter as most often this is perceived as being rude, ex: rolling eyes or getting defensive.

(*Id.* at 4.)

On February 27, 2013, a patient who was also a former Quest employee complained about the rudeness of the phlebotomist she saw earlier that week, as well as the impropriety of the phlebotomist complaining about Quest as an employer, saying that Quest "sucks," and espousing political views. (Ex. 12 to Def.'s Mot. Summ. J. [Doc. #38-4] at 8-9.) The patient described the

offending phlebotomist as a "[v]ery negative, nasty woman." (*Id.* at 9.) In her deposition, Plaintiff "vaguely" recalled having this conversation with the patient but testified that the patient's summary of their conversation was "not correct." (Ex. 1 (Sullivan Dep.) to Def.'s Mot. Summ. J. [Doc. # 38-2] at 26-27.) Plaintiff testified that she did not recall telling the patient that Quest "sucks" and that she "wouldn't say that to a patient." (Sullivan Dep. [Doc. # 40-4] at 16.) Plaintiff recalled discussing Occupy Wall Street with a patient, one of the details included in this patient's narrative complaint, but testified that based on reading the complaint, she thought the patient must have taken her comment about Occupy Wall Street "totally out of context." (*Id.* at 16-17; Sullivan Dep. [Doc. # 38-2] at 26-27; Ex. 12 to Def.'s Mot. Summ. J. at 9.) Plaintiff argues in her Local Rule 56(a)2 statement, however, that "this document has not been authenticated and should not be considered on a motion for summary judgment as it contains hearsay[.]"[1] (Pl.'s L.R. 56(a)2 Stmt. ¶ 20.)

---

[1] Plaintiff's hearsay argument here is misplaced, as the Court would not, for the purpose of deciding this motion, consider the purported patient complaint for the truth of what it states—i.e. that Plaintiff actually engaged in the conduct described by the patient. The complaint's only relevance to this motion, is to show the fact that a complaint was made and the effect on the listener (Defendant), not the truth or falsity of the complaint's contents. The actual veracity and accuracy of this complaint would only really be relevant if there was some reason to think that Defendant had fabricated the complaints or induced patients to make complaints against Plaintiff, or if for example some aspect of the complaint's apparent facial falsity should have put Defendant on notice that it would be unreasonable to rely on the complaint in assessing Plaintiff's performance— neither of which Plaintiff has suggested is the case. With respect to Plaintiff's argument that this document has not been properly authenticated, the Court exercises its "discretion to consider unauthenticated . . . evidence where it is apparent that the party may be able to authenticate . . . [the] document[] at trial." *Delgado v. City of Stamford*, No. 3:11-CV-01735-VAB, 2015 WL 6675534, at *5 n.3 (D. Conn. Nov. 2, 2015) (internal quotation marks and citations omitted). In any event, given the record as a whole, even if the Court declined to consider this document, doing so would not change the result here.

In July or August of 2013, Marisa Hammond became Plaintiff's supervisor. (*Id.* ¶ 21.) Plaintiff received her 2013 performance review from Hammond in February or March of 2014, which rated Plaintiff's overall performance at "achieves expectations." (*Id.*)

On November 18, 2013, Plaintiff injured herself changing the five-gallon water bottle for the water cooler, which resulted in a feeling of "pulling in [her] low back" and pain "radiating into left buttock/hip area." (Ex. 15 to Def.'s Mot. Summ. J. [Doc. # 38-4] at 56-57.) Plaintiff started physical therapy and was also briefly treated by an orthopedic doctor. (Sullivan Dep. [Doc. #38-2] at 75-77.) Plaintiff "used to have to leave work and go for physical therapy" and "a few times, [she] had to cancel [her appointment] because there was no coverage" for her at Quest, despite Hammond attempting to accommodate her, by "tr[ying] to get people over there" to cover for Plaintiff. (*Id.* at 77-78.) Plaintiff was able to go to "most" of her physical therapy sessions, which took place approximately two times per week for five to six weeks. (*Id.* at 78.) Additionally, Plaintiff took two days off work for a nerve conduction test in her legs, for which she used paid time off. (*Id.* at 79-80.)

At her deposition, Plaintiff did not indicate any specific ways in which Hammond had interfered with her ability to receive workers' compensation benefits, but she testified that she began to feel "harassed" and criticized for patient complaints starting around this same time. (*Id.* at 80-81.) With respect to these complaints, Plaintiff said, "I think a lot of it is blown up." (*Id.* at 81.) Plaintiff "felt like [she] was being targeted." (*Id.*)

In August or September of 2014, a "floating" phlebotomist position reporting to Hammond became available. (Pl.'s L.R. 56(a)2 Stmt. ¶ 27.) In that position, the phlebotomist would "float" between various Quest locations overseen by Hammond. (*Id.*) The float phlebotomist role is viewed as a path to a leadership position within Quest and an employee in the role is expected to

assist with training and mentoring other phlebotomists and to have a high level of competence with difficult procedures, including pediatrics, geriatrics and special needs patients. (*Id.*)

Hammond was the hiring manager for this position. (Ex. 13 (Hammond Dep.) to Def.'s Mot. Summ. J. [Doc. # 38-4] at 22.) When filling this type of position, Quest looks first at internal applicants. (*Id.*) Three then-current employees applied—Zander Mitchell, Paula Fernandez, and Plaintiff. (Pl.'s L.R. 56(a)2 Stmt. ¶ 28.) Hammond testified that Paula Fernandez removed herself from contention for the job, and that Hammond conducted two interviews with the remaining candidates—Zander Mitchell and Plaintiff. (Hammond Dep. [Doc. # 38-4] at 23-24.) Hammond testified that she interviewed Plaintiff at Plaintiff's work site for approximately 45 minutes and that she did not know if the interview was conducted at that time because there was a lull in Plaintiff's work that day or it she "actually scheduled the time." (*Id.* at 24.) Plaintiff denies that she was ever interviewed:

> So I put in for that position and was e-mailing Marisa back and forth, back and forth. And they were like dragging their feet on it. What I think is they were dragging their feet on it to give Zander some more time so that his six-month -- it looked like he was there for six months anyway.
>
> And so I wasn't hearing anything from the job. Never got interviewed. Never got a call from human resources. And then she came into the office one day and told me that she gave Zander the job, against policy. He wasn't there for six months.

(Sullivan Dep. [Doc. # 40-4] at 59.)

Hammond testified that after the interview, which Plaintiff denies occurred, she "just felt the motivation was not . . . what [she] she was looking for." (Hammond Dep. [Doc. # 38-4] at 25.) Hammond testified that Plaintiff asked "about the money" and generally provided "answers [that] were not solid as far as . . . experience with helping other employees and training and mentoring." (*Id.*) Hammond claimed that it "just didn't feel to [her] like [Plaintiff was providing] very thought-

out . . . responses" and that Plaintiff "didn't really have a lot to say when [Hammond] asked her about . . . how she might support employees or different ideas that she might come up with to help improve different situations at a patient center." (*Id.* at 25-26)

Hammond testified that she interviewed Zander Mitchell at either her office or the PSC at which Mitchell worked, at which time Mitchell had been there for four to five months. (*Id.* at 26.) Hammond interviewed Mitchell for "35 to 45 minutes" and that she thought he was a good fit for the position. (*Id.*) Hammond testified that she decided to offer the position to Mitchell, rather than Plaintiff for multiple reasons: (1) "he had the experience of floating previously when he was in Florida[,]" (2) he had been "exposed to very, very high volumes, more than any of my [Hammond's] sites it seemed, 250-plus patients[,]" (3) Mitchell stating that "he was used to working very long hours . . . and so I was not concerned about the amount of flexibility or hours that he could work if needed[,]" (4) "he had served as a safety officer and was very . . . excited about being able to come up with different safety ideas and present it to our team," (5) his previous manager gave him an "excellent rating" in his annual performance review and recommended him for floating, (6) the number of positive patient reviews he received, (7) the "very successful performance" that Hammond herself had observed, and (8) while working at the Middletown PSC he provided services for "one of the largest clients that [Quest has] in Connecticut, Pro Health Physicians . . . who is a multi-million-dollar client . . . and he had the client contact aspect too and was very successful with keeping [the client] happy[.]" (*Id.* at 46-47.)

On October 9, 2014, Hammond emailed a group of employees, including Plaintiff, to announce the hiring of Mitchell for the float position. (Ex. 16 to Def.'s Mot. Summ. J. [Doc. # 38-5] at 2.) Hammond noted that

Zander has been with Quest for 3 years and brings with him float experience. He previously was an acting float in Florida and handled many of the float and some group lead responsibilities. He worked in facilities drawing over 200 patients a day and has been very successful in his role in Middletown.

(*Id.*)

At oral argument, Plaintiff conceded that any age discrimination claim on the basis of Defendant's purported failure to hire or promote her into the floater position was time-barred, but argued that Hammond's selection of a younger employee for the role provided evidence supporting Plaintiff's claim that her termination was based on age discrimination.

On October 14, 2014, a patient (who was also a Quest employee) e-mailed Hammond about a negative experience she had at Quest's Wallingford PSC. (Pl.'s L.R. 56(a)2 Stmt. ¶ 34.) The patient told Hammond that she had overheard two phlebotomists, one of whom was Plaintiff, using profanity to discuss how "terrible Quest was" and how "miserable they were" while she and another patient were in the waiting room waiting to be serviced. (*Id.*)

Hammond issued both Plaintiff and the other phlebotomist involved in the incident "Summary of Discussion" warnings. (*Id.* ¶ 36.) The Summary of Discussion Hammond issued to Plaintiff stated "[Plaintiff] is expected to improved [sic] her performance to meet the requirements of her position. If [Plaintiff] needs support or assistance with daily job responsibilities to meet the minimum outlined performance expectations, she is expected to seek support from her supervisor." (*Id.*) It also stated that any additional performance issues would subject Plaintiff to additional corrective action, up to and including termination of employment. (*Id.*)

On November 20, 2014, Felicia Ruccio, who was an employee in Quest's Client Service Department, e-mailed Hammond and Basile to inform them of complaints from a client regarding Plaintiff. (Ex. 19 to Def.'s Mot. Summ. J. [Doc. # 38-5] at 8.) The physician in question had stated

that a patient had returned to him after seeing Plaintiff for blood work and a urine collection, "possibly 2 times" after Plaintiff told the patient that she could not draw his blood or collect his urine. (*Id.*) The doctor requested a call back to discuss the issue. (*Id.*)

The record contains a written warning issued by Hammond to Plaintiff that is dated the following day, November 21, 2014, and which references a series of performance issues and complaints against Plaintiff prior to that date, but which appears to have been signed by Hammond on December 3, 2014—two days after Plaintiff's panic attack, which is discussed below. (Ex. 20 to Def.'s Mot. Summ. J. [Doc. # 38-5] at 10-11.) At oral argument, defense counsel suggested that the reason for the delay in finalizing and/or signing the document might have been attributable to the intervening Thanksgiving holiday between the two dates. Plaintiff has not argued or put forward any evidence to suggest that the document was backdated.

This written warning references the October 14, 2014 Summary of Discussion that Plaintiff received, and asserts that Plaintiff has continued to fail to meet expectations, using as an example an extended discussion of her conversation with the provider who made the complaint that led to the November 20, 2014 email. (*Id.* at 10.) The summary of that discussion is fairly specific, detailed, and covers a number of different occasions on which the provider felt that Plaintiff had failed to service clients appropriately. (*Id.*) Finally, the summary recounts that "[t]he doctor stated this makes him feel foolish to the patient and for using Quest at all." (*Id.*)

Less than two weeks later, on November 30, 2014, a former Quest employee, James Czahur, who was at the time working for a Quest client, ProHealth Physicians, received an e-mail discussing a negative experience the sender's mother had while getting her blood drawn at Quest's Wallingford PSC on November 28, 2014. (Pl.'s L.R. 56(a)2 Stmt. ¶ 41.) The patient had suffered severe bruising following her draw and the sender had attached a picture of the patient's arm

evidencing the severity of the bruising. (*Id.*) Czahur forwarded the e-mail to Basile on December 1, 2014, and Basile then forwarded the e-mail to Hammond. (*Id.*) Hammond spoke with the patient by telephone that same day and determined that Plaintiff had treated this patient. (*Id.*)

On December 1, 2014, Plaintiff was working alone and her PSC was extremely busy. (Sullivan Dep. [Doc. # 40-4] at 28.) As Plaintiff testified, "[p]eople kept coming in and coming in" and "I could hear them all out there chattering and complaining that they were waiting too long." (*Id.* at 28-29.) So Plaintiff called Hammond and asked for help, but "[t]here was no help to be had." (*Id.* at 29.) Plaintiff was "trying to do [her] work" but was feeling pain in her chest and anxiety and as the door kept ringing and additional patients kept arriving, she "started having a panic attack." (*Id.*) Plaintiff was drawing blood from a patient who was also a psychiatrist, and the patient told Plaintiff that she was concerned about her health and state of mind. (*Id.* at 29-30.) As Plaintiff recounted, "[s]he's like, honey, you can't work like this. You just relax. She got up off of the chair and she went out there [to the waiting room] and told them that, you know, Donna can't take any more people . . . She sent the people up to [the] Elm Street [PSC]" which "was right around the corner." (*Id.* at 30-31.)

Plaintiff then called Hammond and "told her that [Plaintiff] was shutting down the facility, that [she] had to get out of there because [she] felt like [she] was going to have a heart attack." (*Id.* at 31.) Plaintiff did not call an ambulance, and instead chose to have her daughter drive her to the hospital. (Pl.'s L.R. 56(a)2 Stmt. ¶ 45.) Plaintiff was diagnosed as having suffered a panic attack. (*Id.*)

Plaintiff had previously requested that Hammond assign other employees to assist Plaintiff at the Wallingford PSC when it had high patient volume. (*Id.* ¶ 53.) Plaintiff testified that she did not want to work alone at the Wallingford PSC when it was busy because "[it] was crazy[.]" (*Id.*)

When Plaintiff returned to work on December 3, 2014, she was assigned to PSCs that were staffed with additional phlebotomists so that she would have more support. (*Id.* ¶ 54.) After a month, Plaintiff returned to the Wallingford PSC and Hammond assigned a part-time employee, Samara Gomez, to support Plaintiff at the Wallingford PSC in the morning. (*Id.* ¶ 55.) In the afternoon there typically was lower patient volume and Plaintiff worked alone. (*Id.*)

But Plaintiff testified that after the panic attack she "started being treated differently" and that she "almost felt like I was getting a . . . label or a stigma that, oh Donna can't handle this." (Sullivan Dep. [Doc. #40-4] at 33.)

On December 1, 2014, the same day Plaintiff suffered a panic attack, Hammond received the email described above regarding a patient's complaint about bruising from a draw on November 28, 2014. (Pl.'s L.R. 56(a)2 Stmt. ¶ 41.) Hammond testified that she determined based on digital records that Plaintiff had serviced that patient, and that Hammond called the patient in question. (Hammond Dep. [Doc. # 38-4] at 30-31.) Because the patient was close to the PSC at that time, she and her daughter-in-law stopped by and spoke with Hammond in person, after Plaintiff had gone to the hospital. (*Id.*)

The occurrence report prepared by Hammond recounts that the patient complained both of bruising and rude treatment by Plaintiff, and that she was made uncomfortable by Plaintiff complaining about having to work on a Friday. (Ex. 22 to Def.'s Mot. Summ. J. [Doc. # 38-6] at 7-8.)

According to Hammond, a second patient also complained to her about Plaintiff on the same day, the details of which are memorialized in a separate occurrence report. (Hammond Dep. [Doc. # 38-4] at 35-36.) Hammond testified that

> I recall thinking it was very odd because I just happened to be at that site, um, that day, because that was the incident with Donna when she had to leave and I was there with another phlebotomist, um, and I was right at the front registering because we had just opened back up and I wanted to apologize why we were closed. And so the first couple of patients that came, this was one of the patients that came and was very upset and happened to tell me that they wanted to complain about - - and happened to tell me that they wanted to complain about what happened. Um, so I took her information. I apologized and I put everything in an incident report.

(*Id.* at 36.) As Hammond testified, the patient was coming back to try to get done the blood work that she had been turned away for previously, and also wanted to complain about her last visit when she was turned away. (*Id.*) According to the occurrence report, "[p]atient stated that Donna was extremely rude[,]" "yelled at her[,]" told her to go get a new order, and made her "feel stupid." (Ex. 23 to Def.'s Mot. Summ. J. [Doc. # 38-6] at 11-12.)

Hammond discussed both complaints with Plaintiff two days later, on December 3, 2014, when Plaintiff returned to work. (Hammond Dep. [Doc. # 38-4] at 36-37.) Plaintiff asserts that "Hammond never talked to her about rudeness to the [first] patient[,] only about the bruise" but in support of this proposition cites only to a portion of Plaintiff's deposition that is not part of the summary judgment record. (Pl.'s L.R. 56(a)2 Stmt. ¶ 50.)

Hammond subsequently issued Plaintiff a Final Written Warning. (Ex. 24 (Final Written Warning) to Def.'s Mot. Summ. J. [Doc. # 38-6] at 15-16.) As with the previous warning, there are two different dates on this document: it is dated December 5, 2014 at the top, and signed by Hammond on December 16, 2014 at the bottom. (*Id.*) Hammond testified that the warning was actually issued on the later date, in response to the two complaints received on December 1, 2014, and that the reason it took some time to be issued was that "a final written warning I don't just write up. It had to be reviewed by HR." (Hammond Dep. [Doc. # 38-4] at 37.) The warning recounts the October 14, 2014 Summary of Discussion, the November 21, 2014 Written Warning,

Plaintiff's unilateral closure of the PSC on December 1, 2014, and the two patient complaints received on that day. (Final Written Warning [Doc. #38-6] at 15-16.)

On January 9, 2015, a patient complained about Plaintiff's demeanor, her confusing instructions, and the fact that the patient would have to return to do a stool test for a second time. (Ex. 28 to Def.'s Mot. Summ. J. [Doc. # 38-7] at 14-15.) The complaint does not on its face identify Plaintiff, but Plaintiff does not dispute that it was made against her. (*See id.*; Pl.'s L.R. 56(a)2 Stmt. ¶ 57.) On February 26, 2015, another patient complained about the way in which Plaintiff collected payment from him. (Ex. 29 to *id.* [Doc. # 38-7] at 17.) On February 28, 2015, a different patient complained about an unnamed disrespectful phlebotomist. (Ex. 30 to *id.* [Doc. # 38-7] at 19.) Hammond first testified that she did not recall whether she ever identified which phlebotomist actually treated that patient. (Ex. N (Hammond Dep.) to Pl.'s Mem. Supp. Obj. to Def.'s Mot. Summ. J. [Doc. # 40-17] at 14.) Later in her deposition, however, Hammond testified that she *had* been able to determine that Plaintiff was the phlebotomist who treated the patient in question. (Hammond Dep. [Doc. #38-4] at 39-40.)

Plaintiff received her 2014 performance review on March 9, 2015. (Ex. 27 to Def.'s Mot. Summ. J. [Doc. # 38-7] at 11.) That review rated her at the "achieves expectations" level for the categories of "following policies & procedures," "work orientation," "deliver quality services," "specimen collection & processing," and "patient information management." (*Id.* at 7-9.) For the higher-weighted categories of "teamwork & collaboration" and "patient interaction & communication," and for her overall rating, she was rated at the "development needed" level. (*Id.*)

The comments in the "teamwork & collaboration" category state that:

Donna does not demonstrate that she is a committed team member/Ambassador of Quest Diagnostics. This was demonstrated by patient complaints and feedback in which she negatively spoke about the company and her job responsibilities. She

does not attempt to understand the needs of the Metro, and chooses to focus only on her needs at her facility. She has acted in an unprofessional manner towards her supervisor and does not effectively [sic] at all times.

(*Id.* at 7.) The comments in the "patient interaction & communication" category state that:

Donna has had patient complaints during 2014 that led to a final written warning in December. While she has received positive comments from patient satisfaction surveys and built a good rapport with some of her regular patients, the negative feedback has a great impact on our patients as a whole . . . some refusing to use Quest in the future. There was also impact to our client within the building. Donna needs to be consistent in her positive interaction with patients and work on keeping cool under pressure, as to keep patient anxiety down.

(*Id.* at 8.) The manager comments section of the review contains, along with positive remarks about Plaintiff's competence and experience, the following:

This year, her performance showed that she lost site [sic] of Patient Services' and the company's core values in two key areas; patient satisfaction and interactions, along with collaboration/communication.

Donna needs to show a marked improvement in her patient interactions and communication to be successful.

(*Id.* at 10.)

On March 11, 2015, Hammond visited Quest's Wallingford PSC to give Samara Gomez her performance evaluation. (Pl.'s L.R. 56(a)2 Stmt. ¶ 63.) Hammond conducted Gomez's performance evaluation in a phlebotomy room with the door closed. (*Id.* ¶ 64.) When Hammond opened the door at the conclusion of the review, Plaintiff was just inches away from the door and had overheard the review. (*Id.* ¶ 65.) Gomez had received an "achieves expectations" overall rating in contrast to Plaintiff's "development needed" rating. (*Id.*) Plaintiff testified that although the door was closed, she heard Hammond speaking "just as clear as a bell." (Sullivan Dep. [Doc. # 38-2] at 62.)

Plaintiff then commented on the review in front of Hammond and Gomez because she wanted to let them know that she had heard it. (*Id.*) Plaintiff was upset by the unfairness of the different review outcomes, but testified that the reason she commented on the review was because she thought it was inappropriate that the review had been conducted in such a way that she and the patient she was with could both hear it. (*Id.* at 63.)

Plaintiff remarked to Lopez what a great review Lopez had received. (*Id.*) Hammond asked Plaintiff "why did you say that?" and Plaintiff replied "Because I just heard the whole review." (*Id.* at 64.) Plaintiff denies that she was being sarcastic in congratulating Lopez on her review and says she meant it sincerely. (*Id.* at 61.) Hammond testified that Plaintiff was congratulating Lopez "very loudly, almost shouting" and that despite Hammond attempting "several times to tell her to please be quiet" because "[t]here were patients in the waiting room and this was unprofessional . . . she ignored me and continued and was clapping her hands and was being completely inappropriate in the workplace." (Hammond Dep. [Doc. # 38-4] at 38.] Todd Engle from Human Resources spoke with Plaintiff about this incident. (Pl.'s L.R. 56(a)2 Stmt. ¶ 69.)

On March 16, 2015, Hammond submitted a termination recommendation for Plaintiff. (Ex. 32 to Def.'s Mot. Summ. J. [Doc. # 38-8] at 6-8.) The document recites, *inter alia*, the October 14, 2014 Summary of Discussion, the December 3, 2014 documented discussion, and the December 16, 2014 final written warning. (*Id.* at 6.) The document describes the "current problem and facts" as consisting of Plaintiff's "additional performance issues" since the issuance of the Final Written Warning, including the patient complaint of February 27, 2015,[2] Plaintiff's inappropriate

---

[2] This patient complaint appears to be the same as the February 28, 2015 patient complaint discussed above, despite the discrepancy in dates.

behavior in front of patients when speaking about her colleague's review, and Plaintiff's meeting with HR following that incident. (*Id.* at 7.)

Plaintiff was terminated on April 1, 2015. (Pl.'s L.R. 56(a)2 Stmt. ¶ 74.) Following Plaintiff's termination, Defendant transferred another employee from its Middletown PSC to the Wallingford PSC to take Plaintiff's place. (*Id.* ¶ 75.) That employee, Maria Benitez, was 39 years old at the time. (*Id.*) Defendant also hired a new employee, Kim Kremzar, to fill the vacant position within Quest's organization. (*Id.*) At the time she was hired, Kremzar was approximately two years older than Plaintiff. (*Id.*)

From July or August of 2013 through 2016, eleven employees who were supervised by Hammond were involuntarily discharged by Quest, six of whom were 40 or older at the time. (Ex. I to Pl.'s Mem. Supp. Pl.'s Obj. to Def.'s Mot. Summ. J. [Doc. # 40-12] at 3.)

## II. Discussion

*Legal Standard*

Summary judgment is appropriate where, "resolv[ing] all ambiguities and draw[ing] all permissible factual inferences in favor of the party against whom summary judgment is sought," *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008), "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (quotation marks omitted). "The substantive law governing the case will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (quoting

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). When considering a motion for summary judgment, the Court may consider depositions, documents, affidavits, interrogatory answers, and other exhibits in the record. Fed. R. Civ. P. 56(c).

    1. *Age Discrimination Claim*

Plaintiff claims that she was terminated in violation of the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621, *et seq*. In the Second Circuit, ADEA claims are analyzed under the burden-shifting framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), as modified by the Supreme Court in *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 180, under which "a plaintiff bringing a disparate-treatment claim pursuant to the ADEA must prove, by a preponderance of the evidence, that age was the 'but-for' cause of the challenged adverse employment action and not just a contributing or motivating factor." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 106 (2d Cir. 2010) (internal quotation marks omitted). "Under *McDonnell Douglas*, the plaintiff bears the initial burden of establishing a prima facie case of discrimination." *Id.* (citation omitted). "If the plaintiff does so, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for its action." *Id.* (citation and internal quotation marks omitted). "Once such a reason is provided, the plaintiff can no longer rely on the prima facie case, but may still prevail if she can show that the employer's determination was in fact the result of discrimination." *Id.* (citation omitted). In order to establish a prima facie of age discrimination, Plaintiff must show "(1) that she was within the protected age group, (2) that she was qualified for the position, (3) that she experienced adverse employment action, and (4) that such action occurred under circumstances giving rise to an inference of discrimination." *Id.* (citation omitted).

Defendant argues that Plaintiff cannot establish a prima facie case because the record lacks evidence that could give rise to an inference that her termination was discriminatory. Plaintiff contends that she has established a prima facie case because she was terminated by a manager who preferred younger employees to older ones. In support of this proposition, Plaintiff points to record evidence that Hammond (1) hired a younger employee instead of her for the floater position and (2) fired a number of other employees aged 40 or over.[3] As noted above, from mid-2013 through 2016, eleven employees who were supervised by Hammond were involuntarily discharged by Quest, six of whom were 40 or older at the time. (Ex. I to Pl.'s Mem. Supp. Pl.'s Obj. to Def.'s Mot. Summ. J. [Doc. # 40-12] at 3.) In other words, approximately half of the employees terminated under Hammond's supervision were 40 or older, and half were under 40. But Plaintiff does not direct the Court to any evidence in the record suggesting, for example, that given the demographics of employees supervised by Hammond, this termination rate for workers over 39 was disproportionate. Accordingly, this evidence does not help Plaintiff establish her prima facie case.

By contrast, the fact that Hammond promoted a much younger employee with significantly less experience than Plaintiff, and who had just moved from Florida so had less familiarity with the Connecticut sites covered by the position, could give rise to a minimal inference of discrimination for prima facie purposes.

Defendant offers, as a legitimate, nondiscriminatory reason for the termination, evidence that Plaintiff was terminated "due to her continued unsatisfactory performance" and her pattern of "act[ing] in a rude and unprofessional manner toward patients, her co-worker and her

---

[3] Plaintiff also testified that she believed that Defendant was hiring a lot of younger people but provides no specific examples, names of employees, or other forms of proof for this claim.

supervisor" *after* she received a Final Written Warning regarding similar conduct. (Def.'s Mem. Supp. Mot. Summ. J [Doc. # 38-9] at 11.)

As described above, the record contains ample evidence of a documented, two-year pattern of patient and client complaints about Plaintiff's demeanor, tone, and professionalism that pre-dates Hammond taking over as Plaintiff's supervisor and long pre-dates Plaintiff's termination. Plaintiff was hired at the age of 49, and after her termination, Defendant hired in her place a new employee who was two years older than she. The record contains no evidence that any younger comparators were treated more favorably than Plaintiff, with the arguable exception of the younger employee who received the floater promotion, but who was himself also terminated later in 2015.

Notably, while Plaintiff testified that "[e]verybody I know that I worked with has gotten complaints[,]" she points to no evidence in the record suggesting that younger comparators received an equivalent or greater number of complaints of comparable significance and yet were not terminated. (Sullivan Dep. [Doc. # 40-4] at 73.) By contrast, Hammond testified that Plaintiff received more complaints than any of the other phlebotomists she supervised, testimony which Plaintiff has not rebutted with her own testimony or any other record evidence. (Hammond Dep. [Doc. # 38-4] at 46.) At oral argument, Plaintiff's counsel did not recall if Plaintiff had sought this type of evidence in discovery, but the docket reflects the fact that Plaintiff did not move to compel Defendant to produce any of this potentially relevant evidence.

Accordingly, no evidence in the record could lead a reasonable jury to determine that Defendant's proffered reason for the termination is false and that age discrimination was the but-for cause of her termination. Defendant's Motion for Summary Judgment must be granted as to this claim.

2. *Disability Discrimination Claim*

Plaintiff also claims that she was terminated on the basis of a perceived disability—having panic attacks[4]—in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.*

"Claims alleging disability discrimination in violation of the ADA are subject to the burden-shifting analysis originally established by the Supreme Court in *McDonnell Douglas Corp. v. Green*[.]" *McBride v. BIC Consumer Prod. Mfg. Co.*, 583 F.3d 92, 96 (2d Cir. 2009) (citations omitted). "A plaintiff must establish a prima facie case; the employer must offer through the introduction of admissible evidence a legitimate non-discriminatory reason for the discharge; and the plaintiff must then produce evidence and carry the burden of persuasion that the proffered reason is a pretext." *Id.* (internal quotation marks and citation omitted).

"To establish a prima facie case under the ADA, a plaintiff must show by a preponderance of the evidence that: (1) h[er] employer is subject to the ADA; (2) [s]he was disabled within the meaning of the ADA; (3) [s]he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) [s]he suffered adverse employment action because of h[er] disability." *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006); *see also Giordano v. City of New York*, 274 F.3d 740, 747 (2d Cir. 2001) (applying same prima facie test in regarded-as disabled discrimination claim).

In a "regarded as" or perceived disability discrimination claim, a plaintiff "need only demonstrate that the employer regarded [her] as impaired, whether or not that impairment is believed to limit a major life activity." *Palmieri v. City of Hartford*, 947 F. Supp. 2d 187, 200 (D. Conn. 2013) (citing *Hilton v. Wright*, 673 F.3d 120, 129 (2d Cir. 2012)).

---

[4] At oral argument, Plaintiff characterized the perceived disability as panic disorder.

Defendant does not dispute that it is subject to the ADA or that Plaintiff suffered an adverse employment action, but maintains that Defendant did not regard Plaintiff as impaired and that Plaintiff did not suffer her adverse employment action—termination—*because* of her perceived disability.

The ADA provides, in relevant part that no employer "shall discriminate against a qualified individual on the basis of disability in regard to . . . [the] discharge of employees[.]"42 U.S.C. § 12112(a). The Act defines "disability" to mean "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). Plaintiff here claims not that she had a disability as defined under 42 U.S.C. § 12102(1)(A) or (B) but that she was "regarded as having such an impairment." *Id.* The Act further provides that "[a]n individual meets the requirement of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A). Finally, an individual does not meet this requirement where the impairment is "transitory and minor[,]" which is defined to have "an actual or expected duration of 6 months or less." The ADA makes clear that employers are not required to provide a reasonable accommodation to an individual who is only covered under the Act as "being regarded as having such an impairment[.]" *See* 42 U.S.C. § 12201(h).

Defendant does not argue that Plaintiff's panic disorder or propensity to suffer panic attacks is "transitory and minor" but does argue that no evidence in the record shows that Defendant actually regarded Plaintiff as having an impairment.

This argument is unavailing. While it is unclear from the record what Hammond knew before December 1, 2014, from that date on, Hammond was clearly aware that Plaintiff suffered from panic attacks. The fact that Hammond may have only been aware of single panic attack at this point was immaterial, as it was a sufficiently serious event that it led Plaintiff to close her PSC and go to the hospital, not to return to work until December 3, 2014. From this point on, Hammond made staffing changes that clearly reflect an awareness of and responsiveness to Plaintiff's perceived condition. As noted above, when Plaintiff returned to work on December 3, 2014, she was assigned to PSCs that were staffed with additional phlebotomists so that she would have more support. (Pl.'s L.R. 56(a)2 Stmt. ¶ 54.) And after a month, Plaintiff returned to the Wallingford PSC, with Samara Gomez now assigned to support Plaintiff at during the morning patient rush. (*Id.* ¶ 55.) Accordingly, there is ample evidence in the record that could lead a reasonable jury to conclude that Defendant regarded Plaintiff as having an impairment.

The only prong of Plaintiff's prima facie case that remains in dispute, then, is whether Plaintiff can raise a genuine issue of material fact as to whether she was terminated because of her perceived impairment.

As other courts have noted, it remains an "open question in this circuit" whether "the ADA requires a plaintiff to show but-for causation," or just that a plaintiff's disability was a motivating factor in an employer's decision to terminate the employment. *See, e.g.*, *DeAngelo v. Yellowbook Inc.*, 105 F. Supp. 3d 166, 175–76 (D. Conn. 2015) (collecting cases). Here, however, under either standard, Plaintiff has met the causation prong of her prima facie case on this motion for summary judgment.

Although Hammond had taken disciplinary actions against Plaintiff prior to her December 1, 2014 panic attack, it was only after the panic attack that Defendant issued Plaintiff a Final

Written Warning. And although the Final Written Warning was issued on December 16, 2014, Hammond initiated the warning on December 5, 2014, four days after the panic attack and two days after Plaintiff returned to work. Moreover, the Final Written Warning itself specifically references the events of December 1, 2014 as one of the reasons she is being put on notice. (Final Written Warning at 15.) Similarly, the Termination Recommendation also references the fact that "Donna clos[ed] her site without coverage" on the date on which she suffered from the panic attack. (Termination Recommendation at 6.) Arguably then, Plaintiff has met the minimal burden of establishing a prima facie case, even under the heightened standard that Plaintiff's perceived disability was the but-for cause of her termination, in light of the Final Written Warning based in large part on her closure of the PSC and conduct while she was having a panic attack.

However, as with Plaintiff's claim for age discrimination, Defendant offers evidence that Plaintiff was in fact terminated as a result of her pattern of rude and unprofessional conduct and demeanor towards patients and fellow employees. As discussed above, Plaintiff points to no evidence from which a jury could draw the inference that she was selectively targeted for discipline, and no evidence to rebut the ample documentary record of a two-year pattern of patient and client complaints about her professionalism and demeanor. Accordingly, Plaintiff offers no evidence that would allow a reasonable jury to find that Defendant's proffered non-discriminatory reason for the termination was false, and summary judgment must be granted for Defendant as to this claim as well.

3. *Workers' Compensation Discrimination and Retaliation Claim*

Finally, Plaintiff claims that she was terminated "because she was injured in the course of her employment, because she exercised or attempted to exercise her rights under the [Connecticut]

Workers' Compensation Act, and/or to prevent her from obtaining benefits under the Workers' Compensation Act[,]" in violation of Connecticut General Statutes § 31-290a.

At oral argument, Plaintiff conceded that as with her claim under the ADA, her key evidence for her claim under the Workers' Compensation Act is the sequence of events between her engaging in protected activity and her subsequent termination.

Here, however, Plaintiff claimed injury in November 2013 but was not terminated until April 2015. Moreover, Plaintiff had not sought to exercise any rights under the Workers' Compensation Act for more than a year prior to her termination, and acknowledges that—aside from her termination, the claim at issue here—Defendant did not in any way interfere with her attempts to exercise those rights. Plaintiff contends that an inference of discrimination can be drawn in her favor given the temporal proximity between a November 26, 2014 email in which she complained of ongoing back and leg pain and requested for additional staff to help at her PSC, and the Final Written Warning, which was initiated on December 5, 2014 and issued on December 16, 2014. While Plaintiff represents that this pain "related to her workers' compensation injury," (Pl.'s Mem. Supp. Pl.'s Obj. to Def.'s Mot. Summ. J. [Doc. # 40-3] at 18), Plaintiff was not exercising or attempting to exercise any rights related to workers' compensation at the time of the email, or for the prior year, and the record provides no indication that Plaintiff intended to do so in the future, or that Hammond believed that Plaintiff intended to do so.

Even assuming, in the context of this motion for summary judgment, that Plaintiff could establish the minimal inference necessary to establish her prima facie case as to this claim, no reasonable jury could find that she was terminated "because [she] . . . filed a claim for workers' compensation benefits or otherwise exercised the rights afford to [her]" under the Workers' Compensation Act. There is no inference to be drawn in Plaintiff's favor given (1) the 18-month

gap between her workplace injury and her termination, (2) the fact that she was rated as "achieves expectations" on her annual performance review delivered *after* that injury, (3) Plaintiff's concession that Defendant did not otherwise interfere with the exercise of her rights under the Act, (4) the lack of any evidence that in the months leading up to the termination, Hammond believed Plaintiff might exercise these rights, and, finally, (5) the lack of record evidence that would cast doubt on Defendant's proffered non-discriminatory and non-retaliatory reason for the termination, as discussed above. Accordingly, Defendant's Motion for Summary Judgment must be granted against Plaintiff as to this claim.

### III.    Conclusion

For the reasons set forth above, the Court GRANTS Defendant's Motion for Summary Judgment as to all claims. The Clerk is respectfully directed to close the case.

IT IS SO ORDERED.

_____/s/_____

Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this  21st day of February 2018.